INMAN, Judge.
 

 *103
 
 Defendant James Anthony Barnett, Jr. ("Defendant") appeals the judgments entered after a jury convicted him of attempted second degree rape, two counts of deterring an appearance by a witness, and assault on a female. Defendant also appeals the postconviction orders entered imposing lifetime satellite-based monitoring ("SBM"), lifetime sex offender registration, and a permanent no contact order. On appeal, Defendant argues that: (1) his convictions for deterring a witness by threats were not supported by legally sufficient evidence; (2) the trial court committed plain error when instructing on the charges of deterring a witness; (3) the habitual misdemeanor assault indictment was fatally defective; (4) the trial court erred in finding that attempted second degree rape is an aggravated offense requiring lifetime SBM and sex offender registration; and (5)
 

 *191
 
 the trial court lacked authority to enter a permanent no contact order prohibiting Defendant from contacting the victim's children.
 

 After careful review, we conclude that Defendant received a trial free from error. However, we reverse the trial court's order imposing lifetime SBM and reverse and remand the lifetime sex offender registration order for entry of an order consistent with this opinion. We also vacate the permanent no contact order and remand for entry of an order consistent with this opinion.
 

 Background
 

 The State's evidence introduced at trial tended to show the following: In late January 2013, Winnie Johnson ("Ms. Johnson" or "the victim")
 
 [1]
 
 met Defendant on a call-in chat line. They began dating shortly thereafter. On or about 29 January 2013, Defendant was taken into
 
 *104
 
 custody and incarcerated at the Alamance County jail for a matter unrelated to this appeal. Following Defendant's release from jail on 14 March 2013, Defendant moved into Ms. Johnson's apartment in Eden, North Carolina. The victim's three daughters, then aged 13, 10, and almost 1, also lived in the apartment.
 

 On or about 22 April 2013, Defendant left the apartment to go to Burlington to meet with his probation officer. While he was away, Ms. Johnson called him to say that she no longer wanted to date him. Although they were in contact via phone and text and Defendant repeatedly requested that Ms. Johnson bring him his clothes, they did not see each other until 22 May 2013, when Defendant showed up at Ms. Johnson's apartment door. Ms. Johnson let Defendant inside. Defendant asked Ms. Johnson to get his clothes, and Ms. Johnson asked him to wait in the living room while she retrieved them.
 

 When Ms. Johnson returned to the living room with Defendant's clothes, Defendant asked for a hug, and Ms. Johnson obliged. Defendant asked Ms. Johnson to engage in sexual intercourse. She repeatedly refused and asked Defendant to leave. Ms. Johnson left the living room and walked down the hall and into a bathroom "to kill time." Defendant followed her to the bathroom and stood outside the door. When Ms. Johnson tried to leave the bathroom, Defendant blocked her way, pushed her into a bedroom, threw her onto the floor and then onto a bed, and began trying to have sexual intercourse with her while repeatedly hitting her in the head and face.
 

 Defendant testified at trial and denied trying to rape Ms. Johnson, but he admitted he "pushed her," "grabbed her by her waist," "punched her in the back of the head," and hit her several more times. Defendant testified that he stopped hitting Ms. Johnson and left her home once she promised she would not have sex with anyone else.
 

 Ms. Johnson testified that before leaving her apartment, Defendant said he would kill her if she called the police. Ms. Johnson then asked a neighbor to call 911. The responding officer testified that when he arrived, Ms. Johnson was crying, disheveled, and had "severe bruises" on her face and body and "a lot of swollen ... lumps on her head." Ms. Johnson was treated and released from the hospital the same day. She testified that following her release from the hospital, she immediately began receiving text messages from Defendant which included threats to kill her.
 

 Defendant was arrested on 29 May 2013 and charged with assault, kidnapping, and rape. After being taken into custody, Defendant began
 
 *105
 
 sending Ms. Johnson threatening letters from jail. Details of those letters are discussed in the relevant sections below.
 

 On 8 July 2013, Defendant was indicted on one count of attempted second degree rape, one count of second degree kidnapping, two counts of deterring an appearance by a witness, one count of assault on a female, one count of habitual misdemeanor assault, and having attained habitual felon status. On 16 July 2014, a jury convicted Defendant of attempted second degree rape, two counts of deterring an appearance by a witness, and assault on a female. Defendant admitted the prior misdemeanor assaults underlying the habitual misdemeanor assault charge and pled guilty to habitual felon status.
 

 *192
 
 The trial court sentenced Defendant to two consecutive terms of 110 to 144 months imprisonment. It also ordered Defendant to register as a sex offender and enroll in SBM for life, and permanently prohibited Defendant from communicating with Ms. Johnson or her three children.
 

 Defendant gave notice of appeal in open court.
 

 Analysis
 

 I. Sufficiency of Evidence of Deterring a Witness
 

 Defendant first argues that the trial court improperly denied his motions to dismiss the charges of deterring a witness by threats. According to Defendant, the convictions were not supported by legally sufficient evidence because "the [victim] was pressured to stay away from court without any threats," or in the alternative, because to the extent that any threats were made, "they related to the parties' personal relationship and not to [this case]." These arguments are without merit.
 

 A trial court's denial of a motion to dismiss is reviewed
 
 de novo.
 

 State v. Smith,
 

 186 N.C.App. 57
 
 , 62,
 
 650 S.E.2d 29
 
 , 33 (2007). "When considering a motion to dismiss, the trial court must determine whether there is sufficient evidence of each essential element of the offenses charged.... If there is sufficient evidence to submit the case to the jury, the motion to dismiss must be denied."
 
 State v. Wade,
 

 181 N.C.App. 295
 
 , 299,
 
 639 S.E.2d 82
 
 , 86 (2007) (citation omitted). The evidence must be viewed "in the light most favorable to the State, giving the State the benefit of all reasonable inferences,"
 
 State v. Fritsch,
 

 351 N.C. 373
 
 , 378-79,
 
 526 S.E.2d 451
 
 , 455 (2000), and "resol[ve] any contradictions in [the State's] favor,"
 
 State v. Greenlee,
 

 227 N.C.App. 133
 
 , 136,
 
 741 S.E.2d 498
 
 , 500 (2013) (internal quotation marks and citation omitted).
 

 *106
 
 C. Gen.Stat. § 14-226(a) provides that a defendant is guilty of intimidating or interfering with a witness if
 

 by threats, menaces or in any other manner [the defendant] intimidate[s] or attempt[s] to intimidate any person who is summoned or acting as a witness in any of the courts of this State, or prevent[s] or deter[s], or attempt[s] to prevent or deter any person summoned or acting as such witness from attendance upon such court.
 

 On appeal, Defendant contends that his motion to dismiss should have been granted because: (1) the two letters introduced at trial to support the first count of deterring a witness did not contain any threats; (2) there was no evidence "presented at trial as to the particular court case in which [Ms. Johnson] had been summoned" which was identified in the first count as 13 CR 51545; (3) there was no evidence presented at trial that Defendant attempted to deter Ms. Johnson from acting as a witness in 13 CR 51698, the case identified in the second count of the indictment; and (4) the dates of offense listed on the indictments did not accurately state the dates of the letters sent to Ms. Johnson and her daughter that contained the threats.
 

 At trial, the State introduced eight letters that Defendant wrote to Ms. Johnson or one of her daughters between 31 May 2013 and 4 August 2013, including one postmarked 4 June 2013 (the date cited in the first count of deterring or attempting to deter a witness) and one postmarked 20 June 2013 (the dated cited in the second count). Excerpts from the two letters specifically referenced in the indictment and other letters include language that, in light of the evidence at trial, a reasonable juror could interpret as threatening or attempting to threaten Ms. Johnson to prevent her from appearing in court.
 

 A. Count I
 

 Ms. Johnson testified at trial that before leaving her home on the day of the assault and attempted rape, Defendant threatened to kill her if she called the police. Defendant reminded her of that threat in a letter postmarked 4 June 2013. Defendant wrote to Ms. Johnson:
 

 What did I tell you, [sic] would happen, if you took charges; [sic] out on me? You remember what I told you. And I'ma [sic] stand by my word. Because you knew not to press charges or go to the hospital. You knew better then [sic] that. Then on top of all that, you lied to the police; about what happen. These charges are fake as
 
 *193
 
 hell. Then you saying that I raped you or attempted to rape you.
 

 *107
 
 Later in that letter, Defendant wrote: "I miss you deeply and love you like crazy. You are not just going to walk, [sic] away from me this easily. Because before you do so, I will kill you or have you killed." Construing this letter with Defendant's earlier threats, a jury could reasonably interpret this letter to constitute a threat of bodily harm or death against Ms. Johnson while she was acting as a witness for the prosecution.
 

 Defendant also contends that the State had to prove the specific court proceeding that he attempted to deter Ms. Johnson from attending since the case number was listed in the indictment. We disagree because the specific case number identified in the first count, 13 CR 51545, is irrelevant information not necessary to support an essential element of the crime.
 
 See
 

 State v. Taylor,
 

 280 N.C. 273
 
 , 276,
 
 185 S.E.2d 677
 
 , 680 (1972) ("Allegations beyond the essential elements of the crime sought to be charged are irrelevant and may be treated as surplusage. The use of superfluous words should be disregarded.").
 

 The essential elements of the offense of deterring a witness are that the defendant threatens, menaces, or in any other manner: (1) intimidates or attempts to intimidate a person who is summoned or acting as a witness in any state court, or (2) prevents, deters, or attempts to prevent or deter a person who is summoned or acting as a witness. N.C. Gen.Stat. § 14-226(a).
 

 The indictment stated:
 

 The jurors for the State upon their oath present that on or about the dates of offense shown and in the county named above the defendant named above unlawfully, willfully and feloniously did by threats attempt to deter and attempt to prevent [Ms. Johnson] from attending court by threatening to kill her if she appeared. [Ms. Johnson] was summoned as a witness in Rockingham County District Court, Case Number 13CR51545.
 

 Because the indictment charged the "summoned" or "acting as a witness" element by stating that Ms. Johnson had been summoned as a witness in a state court, the actual court number of the case listed is merely surplusage and irrelevant.
 
 See generally
 

 State v. Huckelba,
 
 --- N.C.App. ----, ----,
 
 771 S.E.2d 809
 
 , 826 (2015) (concluding that the indictment language identifying the physical address of High Point University was surplusage where the indictment alleged all the essential elements of the crime: that the defendant knowingly possessed a pistol on educational property, High Point University),
 
 rev'd per curiam on other grounds,
 
 -
 
 *108
 
 -- N.C. ----, ----,
 
 780 S.E.2d 750
 
 , 750 (2015) (reversing based solely on the defendant's failure to establish plain error in the jury instructions). Furthermore, the language of the letter clearly indicates that Defendant was trying to prevent Ms. Johnson from further prosecuting the charges arising from the May 2013 incident. Therefore, the duplicative information about the actual court case Ms. Johnson was being summoned to be a witness for was surplusage and was not a fact which the State was required to allege and prove.
 
 See
 

 State v. Springer,
 

 283 N.C. 627
 
 , 637,
 
 197 S.E.2d 530
 
 , 537 (1973).
 

 B. Count II
 

 In a letter to Ms. Johnson postmarked 20 June 2013, the date of the offense listed in the second count of the indictment for deterring a witness, Defendant reiterated, "You know what I told you, before I left your house." In that same letter, Defendant told Ms. Johnson twice not to come to court on 25 June 2013, and referenced "order[ing] [his] hits." In his 20 June 2013 letter to one of Ms. Johnson's daughters, Defendant said if Ms. Johnson did not drop the charges against him he would "order some things to happen which means I will never get out of prison again.... I will never see the courtroom. And neither will your mama. She will be dead because of my orders." In that same letter, Defendant wrote, "Get your mama not to come to court, on Tuesday June 25, 2013."
 

 Defendant's other letters to Ms. Johnson make clear that "ordering a hit" was a threat to murder her. Defendant wrote that he would "put [her] below before [she could put him] away for X amount of years" and threatened to "send [his] lil CRIP homies at [her and her] family."
 

 *194
 
 In the instant case, the State presented ample evidence of threats made by Defendant to inflict bodily harm on Ms. Johnson, a prospective witness in the case against him.
 
 See
 

 State v. Williams,
 

 186 N.C.App. 233
 
 , 237,
 
 650 S.E.2d 607
 
 , 609-10 (2007). Moreover, the fact that Ms. Johnson and her daughter did not receive these letters is irrelevant because the crime of deterring a witness may be shown by actual intimidation or attempts at intimidation.
 
 See
 
 N.C. Gen.Stat. § 14-226(a). Furthermore, as discussed above, the specific case number of the court case Ms. Johnson was acting as a witness for was surplusage and was not a necessary evidentiary showing that the State was required to make. Accordingly, we hold that the trial court did not err in denying Defendant's motion to dismiss these charges.
 

 II. Jury Instructions on Deterring a Witness
 

 Defendant next argues that the trial court committed plain error in its jury instructions on the charges of deterring a witness. Defendant
 
 *109
 
 challenges the trial court's failure to include the word " threat" in one of its deterring a witness instructions, its failure to repeat the deterring a witness instructions in their entirety for each of the two charges, and its failure to instruct the jury that it must find Defendant deterred Ms. Johnson from appearing in case nos. 13 CR 51545 and 51698, the specific case numbers identified in the indictments. We disagree.
 

 For error to constitute plain error, a defendant must demonstrate that a fundamental error occurred at trial. To show that an error was fundamental, a defendant must establish prejudice-that, after examination of the entire record, the error had a probable impact on the jury's finding that the defendant was guilty.
 

 State v. Lawrence,
 

 365 N.C. 506
 
 , 518,
 
 723 S.E.2d 326
 
 , 334 (2012) (internal quotation marks omitted).
 

 The two counts of deterring a witness involved identical legal elements. In explaining these charges, the trial court instructed the jury that in order to find Defendant guilty of deterring a witness under N.C. Gen.Stat. § 14-226, it must find three essential elements beyond a reasonable doubt, including that Defendant "did so by threats." The trial court omitted this part of the instruction in its final mandate on the two charges. Instead, the trial court instructed that
 

 if you find from the evidence beyond a reasonable doubt that on or about the alleged date a person was summoned as a witness in a court of this state, and that the defendant intentionally attempted to prevent or-attempted to deter or deterred that witness from attending court, it would be your duty to return a verdict of guilty.
 

 Defendant contends that this omission constituted plain error.
 

 In light of the trial court's thorough instructions on the elements of these charges, this argument is without merit. "Where the instructions to the jury,
 
 taken as a whole,
 
 present the law fairly and clearly to the jury, [the reviewing Court] will not find error even if isolated expressions, standing alone, might be considered erroneous."
 
 State v. Morgan,
 

 359 N.C. 131
 
 , 165,
 
 604 S.E.2d 886
 
 , 907 (2004) (emphasis added). Further, applying the plain error standard, Defendant has failed to show that the trial court's single omission of the word "threat" in one instruction had a probable impact on the jury's verdict.
 

 *110
 
 Defendant also argues that the trial court erred by not reading the entire instruction for each separate charge of deterring a witness, instead telling the jury:
 

 [T]he defendant has been charged with two counts of deterring the appearance by a witness. It's the same-the law is the same on both counts. I'm not going to read it twice. The first count is the one simply that was alleged to have occurred on June 4, 2013, and the second is the one that is alleged to have occurred on June 20, 2013.
 

 Again, evaluated in the context of all the instructions on the charges of deterring a witness, Defendant has failed to show plain error. The trial court repeatedly instructed the jury that there were two separate charges, to be considered individually, and
 
 *195
 
 accurately instructed that the necessary elements for both charges were identical. He also properly instructed the jury that the only difference was the date of offense. Thus, construing these instructions in their entirety, the trial court did not err by not repeating the instructions verbatim.
 

 Finally, Defendant argues that the trial court committed plain error by not instructing the jury that it must find Defendant deterred Ms. Johnson from appearing in the specific cases listed in the indictment. As discussed above, the actual court case Ms. Johnson was being summoned to be a witness for was surplusage and not an element of the offense.
 
 See
 

 Springer,
 

 283 N.C. at 637
 
 ,
 
 197 S.E.2d at 537
 
 . Thus, the trial court did not commit error, much less plain error, by failing to mention the specific case numbers.
 

 III. Sufficiency of the Habitual Misdemeanor Assault Indictment
 

 Defendant argues that the second count in the indictment for habitual misdemeanor assault failed to allege all the elements of habitual misdemeanor assault because it did not recite all the elements of the offense. We disagree, because the first count in the indictment, alleging misdemeanor assault, alleged all necessary elements of the habitual offense except for the existence of Defendant's prior convictions.
 

 "This Court reviews challenges to the sufficiency of an indictment using a
 
 de novo
 
 standard of review."
 
 State v. Pendergraft,
 
 ---N.C.App. ----, ----,
 
 767 S.E.2d 674
 
 , 679 (2014).
 

 The indictment for 13 CR 1307 included two counts: (1) assault on a female under N.C. Gen.Stat. § 14-33 ; and (2) habitual misdemeanor assault under N.C. Gen.Stat. § 14-33.2. Defendant's indictment for misdemeanor assault specifically alleged that Defendant (1) assaulted a
 
 *111
 
 female person, (2) "caused physical injury to the victim, [specifically] bruises to her head and face," and (3) was a male at least 18 years of age, and Defendant does not dispute that the first count of the indictment properly alleged all elements of assault on a female under N.C. Gen.Stat. § 14-33. Instead, Defendant contends that the second count of the indictment fails to properly allege habitual misdemeanor assault because it did not include "two critical elements": (1) a violation of N.C. Gen.Stat. § 14-33, and (2) a physical injury. Consequently, Defendant contends that the trial court lacked subject matter jurisdiction to enter judgment for habitual misdemeanor assault.
 

 A defendant is guilty of habitual misdemeanor assault, a Class H felony, if
 

 that person violates any of the provisions of G.S. 14-33 and causes physical injury, or G.S. 14-34, and has two or more prior convictions for either misdemeanor or felony assault, with the earlier of the two prior convictions occurring no more than 15 years prior to the date of the current violation.
 

 N.C. Gen.Stat. § 14-33.2. For purposes of Defendant's habitual misdemeanor assault charge, the lower grade offense of assault on a female becomes an element of a higher grade offense.
 
 See
 

 State v. Burch,
 

 160 N.C.App. 394
 
 , 396,
 
 585 S.E.2d 461
 
 , 463 (2003). Thus, to prove Defendant guilty of habitual misdemeanor assault, the State was required to prove the following elements: (1) Defendant was convicted of two misdemeanor assaults, specifically the assaults listed in Count II of the indictment (the 9 September 1999 assault on a government official and the 5 April 2007 assault on a female); (2) Defendant assaulted Ms. Johnson on 22 May 2013, as alleged in Count I of the indictment; and (3) the assault on Ms. Johnson caused physical injury, also alleged in Count I of the indictment.
 

 At the outset, we address the applicability of a N.C. Gen.Stat. § 15A-928 "special accompanying indictment" for a charge of habitual misdemeanor assault. Even though the language of subsection (a) of N.C. Gen.Stat. § 15A-928 appears to limit its applicability to status offenses, this Court has repeatedly concluded that substantive habitual offenses, such as habitual misdemeanor assault and habitual impaired driving, are likewise governed by Chapters 15A and 20, including N.C. Gen.Stat. § 15A-928, unlike habitual status offenses, which are governed
 
 *196
 
 by Chapter 14.
 
 Id.; see also
 

 State v. Williams,
 

 153 N.C.App. 192
 
 , 194,
 
 568 S.E.2d 890
 
 , 892 (2002) (noting that to properly charge a defendant with
 
 *112
 
 felony misdemeanor assault, the prosecutor may use a "special accompanying indictment" pursuant to N.C. Gen.Stat. § 15A-928(b) ).
 

 It is undisputed that Count I of the indictment properly alleged all of the elements of assault on a female, a violation of N.C. Gen.Stat. § 14-33, and included the element that Ms. Johnson suffered physical injury as a result. However, Count II of the indictment, which charged Defendant with habitual misdemeanor assault and properly referenced Defendant's two prior misdemeanor assaults that occurred less than 15 years prior to the date of his current violation, did not include any language regarding Defendant's current charge of assault on a female resulting in a physical injury, a necessary showing for a N.C. Gen.Stat. § 14-33.2 violation. Consequently, Defendant contends that the habitual misdemeanor assault indictment was "fatally defective" for failing to allege all the necessary elements of habitual misdemeanor assault.
 

 This Court rejected arguments similar to Defendant's in
 
 State v. Lobohe,
 

 143 N.C.App. 555
 
 ,
 
 547 S.E.2d 107
 
 (2001), and that decision is controlling in this case. In
 
 Lobohe,
 

 143 N.C.App. at 558-59
 
 ,
 
 547 S.E.2d at 109-10
 
 , the defendant was indicted for one count of impaired driving and a second count of habitual impaired driving. The first count alleged all elements of impaired driving, and the second count alleged the defendant's three prior convictions.
 

 Id.
 

 The defendant argued the second count was fatally defective because it failed to allege all statutory elements of habitual impaired driving
 
 [2]
 
 as required by N.C. Gen.Stat. 15A-924, which provides in part that a criminal indictment must contain "[a] plain and concise factual statement in each count ... supporting every element of a criminal offense and the defendant's commission thereof...." N.C. Gen.Stat. 15A-924(a)(5). This Court rejected that argument, noting that the statute also provides that "[i]n trials in superior court, allegations of previous convictions are subject to the provisions of G.S. 15A-928."
 
 Lobohe,
 

 143 N.C.App. at 558
 
 ,
 
 547 S.E.2d at
 
 109 ; N.C. Gen.Stat. 15A-924(c). In turn, section 15A-928 provides in pertinent part:
 

 (a) When the fact that the defendant has been previously convicted of an offense raises an offense of lower grade to one of higher grade and thereby becomes an element of the latter, an indictment or information for the higher offense may not allege the previous conviction. If a reference to a
 
 *113
 
 previous conviction is contained in the statutory name or title of the offense, the name or title may not be used in the indictment or information, but an improvised name or title must be used which labels and distinguishes the offense without reference to a previous conviction.
 

 (b) An indictment or information for the offense must be accompanied by a special indictment or information, filed with the principal pleading, charging that the defendant was previously convicted of a specified offense. At the prosecutor's option, the special indictment or information may be incorporated in the principal indictment as a separate count.
 

 N.C. Gen.Stat. 15A-928(a) - (b).
 

 We concluded in
 
 Lobohe
 
 that the indictment for habitual impaired driving complied with the requirements of both 15A-924 and 15A-928. The first count, impaired driving, did not allege the defendant's prior convictions, as required by 15A-928(a).
 
 Id.
 
 at 558,
 
 547 S.E.2d at 109
 
 . The second count, which was "contained as a separate count in the principal indictment as permitted by section 15A-928(b)," alleged the defendant's prior convictions.
 

 Id.
 

 This "follow[ed] precisely the required format set forth in section 15-928."
 

 Id.
 

 This Court explicitly rejected the defendant's argument that "an indictment which complies with section 15A-928 is in violation of section 15A-924 because it does not contain in one count the elements of impaired driving as well as the elements which elevate the offense of impaired driving
 
 *197
 
 to that of habitual impaired driving."
 
 Id.
 
 at 559,
 
 547 S.E.2d at 109
 
 .
 

 Following
 
 Lobohe,
 
 we conclude that Defendant's indictment for habitual misdemeanor assault complied with sections 15A-924 and 15A-928.
 
 [3]
 
 The indictment's first count, misdemeanor assault, properly alleged all elements, including "caus[ing] physical injury to the victim." It did not mention Defendant's prior assault convictions, as required by § 15A-928(a). The second count, habitual misdemeanor assault, alleged that "the defendant has been previously convicted of two or more misdemeanor assaults" in violation of N.C. Gen.Stat. § 14-33.2 and listed the dates of those prior convictions. The latter charge was included
 
 *114
 
 "as a separate count in the principal indictment as permitted by section 15A-928(b),"
 
 see
 

 Lobohe,
 

 143 N.C.App. at 558
 
 ,
 
 547 S.E.2d at 109
 
 . Accordingly, the indictment was sufficient, and the trial court did not lack subject matter jurisdiction over the habitual assault charge.
 

 IV. Imposition of Lifetime Satellite-Based Monitoring and Sex Offender Registration and Entry of Permanent No Contact Order
 

 Defendant next argues that the trial court violated various statutory provisions by imposing lifetime SBM, lifetime sex offender registration, and a permanent no contact order that included the victim's family members. Because Defendant failed to give written notice of appeal from any of these orders, he seeks review by petition for writ of
 
 certiorari
 
 and, with respect to two of the orders, the State concedes error. Given these circumstances, we will allow the petition and review these orders.
 

 Defendant's arguments allege statutory errors which we review
 
 de novo.
 

 State v. Mackey,
 

 209 N.C.App. 116
 
 , 120,
 
 708 S.E.2d 719
 
 , 721 (2011) (internal citation omitted).
 

 A. Lifetime SBM and Sex Offender Registration
 

 Defendant argues, and the State concedes, that the trial court erroneously concluded that attempted second degree rape is an aggravated offense under N.C. Gen.Stat. § 14-208.6(1a) and, in doing so, violated N.C. Gen.Stat. § 14-208.40A (SBM statute) and N.C. Gen.Stat. §§ 14-208.7 and 14-208.23 (sex offender registration order statutes). We agree. Accordingly, we reverse the lifetime SBM order, and reverse and remand the registration order for entry of an order requiring Defendant to register as a sex offender for a period of thirty years.
 

 In North Carolina, a defendant convicted of an aggravated offense must enroll in lifetime SBM.
 
 See
 
 N.C. Gen.Stat. § 14-208.40A(c). A defendant convicted of an aggravated offense is also subject to mandatory lifetime sex offender registration. N.C. Gen.Stat. § 14-208.23. However, an offender who has committed a reportable, but non-aggravated, offense, and whose offense does not otherwise require lifetime registration, is subject to mandatory registration order for a period of thirty years. N.C. Gen.Stat. § 14-208.7(a).
 

 North Carolina law defines an aggravated offense as
 

 any criminal offense that includes either of the following: (i) engaging in a sexual act involving vaginal, anal, or oral penetration with a victim of any age through the use of force or threat of serious violence; or (ii) engaging in a
 
 *115
 
 sexual act involving the vaginal, anal, or oral penetration with a victim who is less than 12 years old.
 

 N.C. Gen.Stat. § 14-208.6(1a). Thus, pursuant to G.S. § 14-208.6(1a), an aggravated offense requires a sexual act involving an element of penetration.
 

 Here, Defendant was convicted of attempted second degree rape. A conviction for attempted rape does not require penetration, and thus does not fall within the statutory definition of an aggravated offense.
 
 See
 

 State v. Davison,
 

 201 N.C.App. 354
 
 , 364,
 
 689 S.E.2d 510
 
 , 517 (2009) (when determining whether to impose satellite-based monitoring, "the trial court is only to consider the elements
 
 *198
 
 of the offense of which a defendant was convicted and is not to consider the underlying factual scenario giving rise to the conviction."). The trial court erred in its finding to the contrary.
 
 See
 

 id.,
 

 201 N.C.App. at 362
 
 ,
 
 689 S.E.2d at 515
 
 ("[W]hile a completed first-degree sexual offense would be an aggravated offense, an attempted first-degree sexual offense is not an aggravated offense."). Because the trial court's imposition of lifetime SBM was based solely on the trial court's finding that attempted second degree rape is an aggravated offense, we must reverse the order requiring lifetime SBM.
 

 Similarly, the trial court's order requiring Defendant register as a sex offender for his lifetime was based only on its finding that attempted second degree rape is an aggravated offense. As noted, because attempted second degree rape is a non-aggravated offense, we must also reverse the registration order. However, because attempted second degree rape constitutes a sexually violent offense, it is a reportable conviction.
 
 See
 
 N.C. Gen.Stat. §§ 14-208.6(4)(a), 14-208.6(5). Therefore, on remand, the trial court should enter a registration order requiring Defendant to register as a sex offender for a period of thirty years.
 
 See
 
 N.C. Gen.Stat. § 14-208.7.
 

 B. Permanent No Contact Order
 

 Finally, Defendant argues that the trial court erred when it entered a permanent no contact order preventing Defendant from contacting not only Ms. Johnson, the victim of the crime, but also her three children. The trial court's order, according to Defendant, unlawfully subjects him to potential "criminal prosecution for having contact with individuals who were not victims of the sex offense of which he was convicted." The State argues that extending the no contact order to the victim's children is permissible under N.C. Gen.Stat. § 15A-1340.50(f), which provides that when granting a permanent no contact order in sex offense cases, a
 
 *116
 
 court may,
 
 inter alia,
 
 " [o]rder other relief deemed necessary and appropriate by the court." N.C. Gen.Stat. § 15A-1340.50(f)(7).
 

 Under N.C. Gen.Stat. § 15A-1340.50, "[w]hen sentencing a defendant convicted of a sex offense, the judge, at the request of the district attorney, shall determine whether to issue a permanent no contact order." N.C. Gen.Stat. § 15A-1340.50(b). Following a "show cause" hearing, "the judge shall enter a finding for or against the defendant". If the judge determines that reasonable grounds exist for the victim to fear any future contact with the defendant, the judge shall issue the permanent no contact order. N.C. Gen.Stat. § 15A-1340.50(e). In making its determination, the court must "enter written findings of fact and the grounds on which the permanent no contact order is issued."
 

 Id.
 

 Having concluded a permanent no contact order is warranted, a court may award several forms of relief enumerated in the statute, including "other relief deemed necessary and appropriate by the court." N.C. Gen.Stat. § 15A-1340.50(f)(7).
 

 Whether a trial court may extend a permanent no contact order under N.C. Gen.Stat. § 15A-1340.50 (
 
 i.e.,
 
 in the context of convicted sexual offenders specifically) beyond the individual victim appears to be a matter of first impression. In
 
 State v. Hunt,
 

 221 N.C.App. 48
 
 , 56,
 
 727 S.E.2d 584
 
 , 590 (2012), this Court held that, like satellite-based monitoring, permanent no contact orders issued in sexual offense cases constitute a civil, nonpunitive means of "protect[ing] society from recidivists." Dicta in
 
 Hunt
 
 suggests that this Court understood section 15A-1340.50 as applying only to the specific victim in a given case and not to a broader group of people:
 

 [ N.C. Gen.Stat. § 15A-1340.50 ] only protects one citizen from the threat posed by recidivist tendencies, as opposed to all citizens of our state ... [I]t offers protection to one who has already been victimized and is still in fear of the defendant as opposed to protecting the general population against a more unspecified threat.... Again, N.C. Gen.Stat. § 15A-1340.50 is specifically intended to protect a victim from sex offenders who quite frequently repeat the unlawful conduct.
 

 Id.
 
 at 56,
 
 727 S.E.2d at 590-91
 
 (emphasis added). Section 15A-1340.50 addresses permanent no contact orders vis-à-vis the defendant
 
 *199
 
 and the victim only. A "victim" is "[t]he person against whom the sex offense was committed." N.C. Gen.Stat. § 15A-1340.50(a)(3).
 

 The trial court here imposed a permanent no contact order against Defendant, providing: "This order includes the following individuals,"
 

 *117
 
 naming the victim's three children, as an "[a]dditional necessary and appropriate restriction." The State argues that the trial court had discretion to extend the no contact order to the victim's children based on Defendant's familiarity with the children and because the children all live with the victim, the sexual offense occurred in their home, and Defendant sent a letter to one of the children threatening to harm their mother. We disagree, because the plain language of the statute limits the trial court's authority to enter a no contact order protecting anyone other than the victim.
 

 As this Court observed in
 
 Hunt,
 
 N.C. Gen.Stat. § 15A-1340.50 unambiguously protects a
 
 particular victim
 
 of a sexual offense. It follows that a court's discretion to expand the reach of a no contact order under this section must be supported by potential risks
 
 to the victim,
 
 whether direct or indirect, but the order itself is directed only to the victim. N.C. Gen.Stat. § 15A-1340.50 consistently and repeatedly refers only to "the victim" and not to any other person.
 

 State v. Elder,
 

 368 N.C. 70
 
 ,
 
 773 S.E.2d 51
 
 (2015), is instructive in our interpretation of this statute. In
 
 Elder,
 
 3 68 N.C. at 72,
 
 773 S.E.2d at 53
 
 , our Supreme Court considered the scope of relief that the trial court may include in a domestic violence protective order ("DVPO") under the "catch-all" provision in N.C. Gen.Stat. § 50B-3(a)(13), which states that a protective order may "[i]nclude any additional prohibitions or requirements the court deems necessary to protect any party or any minor child." N.C. Gen.Stat. § 50B-3(a)(13). The
 
 Elder
 
 Court held that the word "any" did not authorize the trial court "to order law enforcement to search a defendant's person, vehicle, or residence under a DVPO."
 
 Elder,
 

 368 N.C. at 72
 
 ,
 
 773 S.E.2d at 53
 
 . The Court explained that the "catch-all" provision was the last in a list of 12 other provisions which the trial court may include in the DVPO and must be interpreted consistently with the other items in the list:
 

 The word "any" in the catch-all provision modifies "additional prohibitions or requirements," N.C.G.S. § 50B-3(a)(13), and this provision follows a list of twelve other prohibitions or requirements that the judge may impose on a party to a DVPO,
 

 id.
 

 § 50B-3(a)(1)-(12). For example, the court may prohibit a party from harassing the other party or from purchasing a firearm, and it may require a party to provide housing for his or her spouse and children, to pay spousal and child support, or to complete an abuser treatment program.
 

 Id.
 

 § 50B-3(a)(3), (6), (7), (9), (11), (12). It
 
 *118
 
 follows, then, that the catch-all provision limits the court to ordering a party to act or refrain from acting; the provision does not authorize the court to order law enforcement, which is not a party to the civil DVPO, to proactively search defendant's person, vehicle, or residence.
 

 Id.
 

 In a fashion similar to the statute providing for a DVPO, N.C. Gen. Stat. § 15A1340.50 lists seven prohibitions which the court may include in a permanent no contact order in sex offenses cases. It may:
 

 (1) Order the defendant not to threaten, visit, assault, molest, or otherwise interfere
 
 with the victim.
 

 (2) Order the defendant not to follow
 
 the victim,
 
 including at
 
 the victim's
 
 workplace.
 

 (3) Order the defendant not to harass
 
 the victim.
 

 (4) Order the defendant not to abuse or injure
 
 the victim.
 

 (5) Order the defendant not to contact
 
 the victim
 
 by telephone, written communication, or electronic means.
 

 (6) Order the defendant to refrain from entering or remaining present at
 
 the victim's
 
 residence, school, place of employment, or other specified places at times when
 
 the victim
 
 is present.
 

 (7) Order other relief deemed necessary and appropriate by the court.
 

 N.C. Gen.Stat. § 15A-1340.50 (emphases added).
 

 *200
 
 Reading 15A-1340.50(f) in the same manner as our Supreme Court construed a similar statute in
 
 Elder,
 
 we cannot adopt the broad reading urged by the State. The statute consistently addresses prohibitions of certain actions by the defendant against
 
 the victim
 
 and not against any other persons.
 

 This reading of the statute may not necessarily mean that a defendant's action must be physically or literally directed to "the victim" to fall under the prohibitions of a no contact order protecting just the victim. For example, a defendant could "harass the victim" by indirect contact through her family members or even her close friends, since
 

 [h]arassment is defined as "knowing conduct ... directed at a specific person that torments, terrorizes, or terrifies
 
 *119
 
 that person and that serves no legitimate purpose." N.C. Gen.Stat. § 14-277.3 (2005). The plain language of the statute requires the trial court to apply only a subjective test to determine if the aggrieved party was in actual fear; no inquiry is made as to whether such fear was objectively reasonable under the circumstances.
 

 Wornstaff v. Wornstaff,
 

 179 N.C.App. 516
 
 , 518-19,
 
 634 S.E.2d 567
 
 , 569 (2006).
 

 In fact, this Court has held that contacting a victim's family members may constitute an indirect means of communicating with a victim in violation of a DVPO under Chapter 50B. In
 
 Marshall v. Marshall,
 

 233 N.C.App. 238
 
 , ----,
 
 757 S.E.2d 319
 
 , 326 (2014), a defendant contended that a DVPO "only barred him from contacting or harassing [the victim] herself such that his admitted contact with [the victim's] friends, family, and associates was not a violation of the DVPO." This Court rejected that argument, observing that "the plain language of the DVPO bar[red] Defendant from abusing or harassing [the victim] 'by telephone, visiting the home or workplace
 
 or other means
 
 [.]' "
 

 Id.
 

 (emphasis in original). The trial court made numerous findings of fact that the defendant harassed the victim's parents, children, other family members, and friends, and concluded "these communications were indirect contacts with [the victim] specifically barred by the DVPO."
 

 Id.
 

 We need not speculate all the ways in which a defendant might violate a no contact order issued under N.C. Gen.Stat. § 15A-1340.50, and if we did, we would probably fail to imagine the ingenuity of future defendants. The authority of the trial court to enter an order under the statute is limited to prohibiting actions by the defendant against "the victim" based on the plain language of the statute. Accordingly, the trial court did not have authority under the catch-all provision to enter a no contact order specifically including persons who were not "victims" of the "sex offense" committed by Defendant,
 
 see
 
 N.C. Gen.Stat. § 15A-1340.50(a)(2) and (3), and that portion of the no contact order identifying the victim's children must be vacated.
 

 Conclusion
 

 Based on the foregoing reasons, we conclude that Defendant received a trial free of error. However, we reverse the trial court's lifetime SBM order, reverse and remand the lifetime sex offender registration order for entry of a new order requiring registration for a period of thirty years, and we vacate and remand the permanent no contact
 
 *120
 
 order so the trial court may remove mention of any individuals other than the victim.
 

 NO ERROR IN TRIAL; SBM ORDER REVERSED; REGISTRATION ORDER REVERSED AND REMANDED; PERMANENT NO CONTACT ORDER VACATED AND REMANDED.
 

 Judges CALABRIA and STROUD concur.
 

 [1]
 

 A pseudonym has been used to protect the identity of the victim.
 

 [2]
 

 "A person commits the offense of habitual impaired driving if he drives while impaired ... and has been convicted of three or more offenses involving impaired driving ... within 10 years of the date of this offense." N.C. Gen.Stat. § 20-138.5(a).
 

 [3]
 

 We note that habitual misdemeanor assault, like habitual impaired driving, is a substantive offense.
 
 Lobohe,
 

 143 N.C.App. at 559
 
 ,
 
 547 S.E.2d at
 
 110 ;
 
 State v. Smith,
 

 139 N.C.App. 209
 
 , 213-14,
 
 533 S.E.2d 518
 
 , 519-20 (2000).